**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**August 2, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

CINDY ROE,

     Plaintiff - Appellant.

v.

FCA US LLC, f/k/a Chrysler Group LLC,
f/k/a Chrysler LLC, f/k/a Daimler Chrysler,

     Defendant - Appellee.

No. 21-6073

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:19-CV-00167-SLP)**
_____

Rosalind B. Bienvenu, Durham, Pittard & Spalding, LLP, Santa Fe, New Mexico (Caren I. Friedman and Justin R. Kaufman, Durham, Pittard & Spalding, LLP, Santa Fe, New Mexico, and David T. Bright, Sico Hoelscher Harris, Corpus Christi, Texas, with her on the briefs), for Plaintiff-Appellant.

Ryan C. Bueche, Germer Beaman, & Brown, PLLC, Austin, Texas (Robert G. Sonnier, Germer Beaman & Brown, PLLC, Austin, Texas, and Heather L. Hintz and Thomas G. Wolfe, Phillips Murrah, P.C., Oklahoma City, Oklahoma, with him on the brief), for Defendant-Appellee.

_____

Before **MATHESON**, **EBEL**, and **BACHARACH**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

Plaintiff-Appellant Cindy Roe suffered serious injuries after her Jeep Grand Cherokee unexpectedly backed over her. After the accident, she filed a lawsuit in federal district court against the manufacturer of her vehicle, FCA US ("FCA"), alleging that the shifter assembly in her vehicle had been defectively designed in that it could be perched into a "false-park" position where the vehicle appears to be in park, but is actually in an unstable position that can slip into reverse. Roe further alleged that this defect caused her injuries. To demonstrate this theory, she designated two experts, Steven Meyer and Peter Sullivan. After testing and analysis of the subject vehicle, the experts concluded that the vehicle was in this defective false-park position when Roe exited the vehicle, and the vehicle then slipped into reverse and backed over her, causing her injuries.

FCA moved to exclude Roe's experts as unreliable on the issue of causation, among other objections. FCA additionally moved for summary judgement because Roe could not create a material issue of fact on the essential element of causation without her experts' testimony. The district court agreed with FCA, excluded the experts, and granted summary judgment for FCA. Notably, the district court found that the experts' theory on causation was unreliable because they failed to demonstrate that the shifter could remain in false park for sufficient time for Roe to move behind the vehicle and then slip into reverse without manual assistance. Roe now appeals, arguing that the district court abused its discretion in excluding Meyer and Sullivan's testimony. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

2

## FACTUAL BACKGROUND

### A. The Accident

On February 26, 2017, Roe was driving her 2004 Jeep Grand Cherokee on a rural property near Cushing, Oklahoma. After driving through a gate on the property, she stopped and exited the car to close the gate behind the rear of the car. Tragically, her Jeep suddenly moved backwards and rolled over her. Roe was eventually found by the vehicle near the gate having suffered severe injuries including a traumatic brain injury.

Roe filed suit in federal district court against FCA, the manufacturer of her vehicle, for product liability, negligence, and failure to warn, alleging that her vehicle "improperly and unexpectedly jumped into reverse on its own after she had shifted it into park and exited the vehicle, running over her and causing traumatic and permanent injuries." Aplt. App. at 12. Roe claimed that the shifter assembly of the subject vehicle was defectively designed in that it could be shifted into a "false-park" position where the shifter appears to be in park, but is actually in an unstable position where the shifter can self-engage into reverse. Roe alleged this defective position allowed her Jeep to slip into reverse and caused her injuries.

### B. Roe's Experts

To support her theory, Roe designated two experts, Steven Meyer and Peter Sullivan to testify as to "automotive defects, engineering issues, the automotive components involved and their functioning; the 'false park', 'park to reverse', or 'powered rollaway' defect, the history of this defect in Chrysler and other vehicles,

and other similar incidents; applicable regulations, industry standards, and investigations; investigation and testing; and the causes of Cindy Roe's injuries." Id. at 67.

### i.     Steven Meyer

Steven Meyer is a mechanical engineer specializing in vehicular accident reconstruction; mechanical and structural failure analysis; and system design, analysis, and testing.  In his report, Meyer surmised two potential hypotheses for how the accident could have occurred: 1) Roe shifted the vehicle into a false-park position before exiting and moving behind the vehicle when it then slipped into reverse and backed over her, and 2) Roe shifted the vehicle into reverse before exiting and moving behind the vehicle when it backed over her.  After testing on Roe's Jeep, an exemplar 2004 Jeep Grand Cherokee, and an exemplar shifter, Meyer determined that the second scenario was impossible and that the first scenario had a reasonable scientific probability of being correct.

First, Meyer inspected and tested the subject vehicle on a flat concrete surface at his company's facility.  In inspecting and testing the gear shifter assembly, Meyer was able to "easily" manipulate the shifter lever to achieve the "perched" false-park condition.  Id. at 120.  He then performed testing on two scenarios.  In the first, he shifted the vehicle from drive to reverse. After releasing the brake pedal, "the vehicle immediately began to move/accelerate" on the flat concrete surface.  Id.  In the second scenario, Meyer manually perched the vehicle in the false-park position.  The "shifter was then nudged rearward, resulting in the transmission to engage the reverse

4

gear.  Once the shifter was nudged rearward, the vehicle began to move rearward after a slight hesitation."  Id. at 120–21.  Meyer then recorded the amount of force necessary to move the shift lever from the false-park position to reverse, which ranged between 13 and 26 newtons.[1]

Next, Meyer performed the same evaluation and testing a second time with an exemplar vehicle at the accident scene and repeated it a third time at his facility.  He noted that the "[v]ehicle response was similar with little to no difference due to the ground condition or terrain."  Id. at 123.  He also noted that "by leaving the vehicle in reverse, the driver could not exit the vehicle as the vehicle moved too fast for the driver to get out of the way of the moving open door," effectively ruling out his second hypothesis.  Id. at 126.  He did not state in his report whether he achieved test results indicating there was sufficient time to exit the vehicle when the shifter was left perched in false park.

At Meyer's deposition, he estimated that it would take at least seven to eight seconds to exit the Jeep and walk behind it.  While he referenced several instances of the vehicles slipping on their own from false park to reverse, he could not recall if the shifter ever slipped into reverse after staying perched for precisely seven to eight seconds.  Meyer could recall one test where the vehicle stayed perched in the false-

---

[1] A newton is the "absolute unit of force in the International System of Units (SI units), abbreviated N.  It is defined as that force necessary to provide a mass of one kilogram with an acceleration of one metre per second per second." Encyclopedia Britannica, newton unit of measurement, https://www.britannica.com/science/newton-unit-of-measurement.

park position for over four minutes, but in this test, he manually nudged the shifter into reverse from false park. Meyer additionally discussed a National Highway Traffic Safety Administration (NHTSA) investigation into a "park-to-reverse" defect in Jeep Grand Cherokees.[2]

Meyer concluded in his reconstruction of the accident that a flat spot between park and reverse in the shifter assembly is a design defect that allowed Roe to unknowingly perch the subject vehicle in false park instead of park. Meyer surmised that when she exited the vehicle and moved behind it, the shifter lever slipped into reverse and the vehicle backed over her. Meyer also concluded that FCA could have feasibly installed an out-of-park alarm that would have warned Roe and others of this unsafe condition.

### ii.    Peter Sullivan

Roe's other expert was Peter Sullivan. Sullivan is an automotive specialist and master service technician with specialized experience as a motor vehicle systems performance analyst. Sullivan has evaluated and written on shift systems throughout his career, including numerous park-to-reverse incidents.

Sullivan created an exemplar demonstrative aid of the subject vehicle shifter and transmission, on which he was able to achieve the false-park position. Sullivan relied in large part on Meyer's investigation and testing as to the ability to achieve

---

[2] The parties argue about the relevance of this report. FCA claims that it is irrelevant because the vehicles in the report use a different transmission. While Roe agrees in her Reply Brief that they are not the same, she argues that they function "largely the same." R. Br. at 5.

false park and the timing of the vehicle's backward movement when the vehicle is

placed in reverse versus when the vehicle slips into reverse from false park.  He also

discussed five forces that may cause the shift lever to move from false park to

reverse.  These included:

> [1] [S]light vibrations, [2] movements, [3] impacts, or [4] weight transfers (such as a passenger opening or closing a door upon exiting the vehicle or opening or closing the rear lift/tail gate, or engine vibration, A/C compressor engagement, etc.), or [5] the gradual filling of the transmission coupling , [sic] 'accumulator', with transmission fluid as a result of fluid bypass through a partially open manual valve.

Id. at 206–207.  Sullivan also relied on the NHTSA report on Jeep Grand

Cherokees.

Like Meyer, Sullivan concluded that Roe left her Jeep in a defective false park

rather than reverse when she exited the vehicle.  He asserted that the Jeep then

suddenly and without warning self-engaged into reverse, resulting in her injuries.

Sullivan also opined that an out-of-park alarm could have been implemented to

provide a warning.

## C. The district court's decision

After the expert reports and depositions had been submitted, FCA filed a

motion under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to

exclude the two experts and also for summary judgment.  FCA contended that Meyer

and Sullivan were both unqualified to testify as to a design defect in the shifter

assembly, to opine as to the underlying accident, and to testify as to an out-of-park

alarm.  Further, FCA contended that the methods used by both experts to conclude the alleged defect caused the accident were unreliable.

The district court granted the motion to exclude both experts and entered summary judgment for FCA.  While the district court found that Meyer was qualified to opine as to the events of the accident and causation, he lacked the expertise to be qualified to testify as to a design defect in a shifter assembly.  The court did find, however, that Sullivan was qualified as to the defective design of the shifter assembly and to opine on the events of the accident.  The court found both experts to be unqualified and unreliable to testify as to the effectiveness of out-of-park alarms.

As to causation, the court found that both experts used unreliable methods due to an analytical gap in their theory about how the defective design caused the plaintiff's injury.  Specifically, the court found that they had not sufficiently shown that the shifter could self-engage into reverse from the false-park position after enough time for Roe to exit the vehicle and move behind it.  Further, the court found that the experts had not shown or explained that the forces that might cause the lever to slip into reverse were present in the subject vehicle.  Based upon its rulings on FCA's Daubert motion, the district court also granted FCA's motion for summary judgment because Roe failed "to show a genuine dispute over whether the alleged defects (the Jeep's self-shift into reverse and/or lack of an out-of-park alarm) caused Plaintiff's injuries."[3]  Id. at 1283–85.

---

[3] Under Oklahoma law, a product liability claim requires a plaintiff to prove

Roe now appeals, challenging the exclusion of her experts and the resulting summary judgment order. She raises three issues, arguing that the district court erred in 1) excluding Meyer and Sullivan's testimony as unreliable due to analytical gaps in their theory of causation, 2) determining that Meyer was not qualified to testify on the defective design of the subject vehicle's shifter assembly, and 3) determining that Meyer and Sullivan were not qualified or reliable to testify on the installation of an out-of-park alarm. The parties agree that if Roe's experts were properly excluded, summary judgment must be granted in FCA's favor.

## DISCUSSION

### A. The district court did not abuse its discretion in excluding Meyer and Sullivan's testimony

Roe contends that the district court abused its discretion in finding her experts unreliable on causation. Importantly, "[w]e review the district court's application of Daubert to exclude expert testimony for abuse of discretion." Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1210 (10th Cir. 2004). And we review de novo whether the district court applied the proper legal standard under Daubert. Goebel v. Denver and Rio Grande Western R.R., 215 F.3d 1083, 1087 (10th Cir. 2000). The district court is afforded substantial deference in its application of Daubert, and we will only disturb the district court's decision if we have "a definite and firm

that the alleged defect: (1) caused the injury in question, (2) existed at the time it left the manufacturer's control, and (3) made the product unreasonably dangerous. Braswell v. Cincinnati Inc., 731 F.3d 1081, 1085 (10th Cir. 2013) (citing Kirkland v. Gen. Motors Corp., 521 P.2d 1353, 1363 (Okla. 1974)).

9

conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." Truck Ins. Exch., 360 F.3d at 1210 (quoting United States v. Ortiz, 804 F.2d 1161, 1164 n. 2 (10th Cir. 1986)). We conclude that the district court did not abuse its broad and substantial discretion in excluding this testimony as unreliable because the experts left an analytical gap in their theory of causation by failing to show a reasonable probability that there was sufficient time for Roe to get behind the vehicle after placing it into false park before it would slip into reverse without further human nudging.

Under Federal Rule of Evidence 702, the district court has an important gatekeeping function with regard to the admissibility of expert opinions to ensure that all evidence is both relevant and reliable. See generally Daubert, 509 U.S. at 597. In order to determine whether Meyer and Sullivan's expert opinions were admissible, the district court had to undergo a two-step analysis. First, the court had to determine whether the experts were qualified by "knowledge, skill, experience, training, or education" to render an opinion. See Fed. R. Evid. 702. Second, if they were so qualified, the court had to determine whether their opinions were "reliable" under the principles set forth under Daubert, 509 U.S. 579, and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). The reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case. See Kumho Tire, 526 U.S. at 152. The inquiry does not typically question "the quality of the data used in applying the methodology or the conclusions produced." In re Urethane Antitrust

Litig., 768 F.3d 1245, 1263 (10th Cir. 2014).  However, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

The district court here found the experts' testimony unreliable due to such an analytical gap in the experts' theory because the experts had not demonstrated in their testing that a shifter could self-engage from false park to reverse after the seven to eight seconds needed for Roe to exit and move behind the vehicle.[4]  Aplt. App. at 1272.  Meyer's report only referenced instances in testing where he manually shifted the car from false park to reverse and measured the force needed, and his deposition indicated that he could not remember if he had a result where the shifter self-engaged into reverse after the requisite time.  While Sullivan listed some potential forces that could cause a shifter to slip from false park into reverse (slight vibrations, movements, impacts, or weight transfers, etc.), the experts did not address which, if any, of these may have been present in the subject vehicle or whether these

---

[4] The district court found it unclear whether the experts had shown that the shifter could slip on its own at all.  Aplt. App. at 1272.  There are several instances in Meyer's deposition where he refers to the shifter slipping on its own without a manual nudge.  See, e.g., Aplt. App. at 1028 ("In some cases I perch it, I know its perched, and I go to let go, and by the time I move my hand out of the way, it's moving already.").  But that scenario assumes an almost immediate shifting into reverse after the driver lifted his or her hand from the level.  By Roe's own admission, that is not what happened here.

forces were capable of generating the number of Newtons in the proper direction needed to cause the shifter to self-slip into reverse.

Roe argues that the district court abused its discretion for essentially two reasons. First, Roe believes no such analytical gap exists because the experts did in fact demonstrate test results showing that the lever could slip into reverse after sufficient time. Second, Roe believes the district court impermissibly required the experts to test their theory. We disagree as to both reasons.

Roe argues that no such analytical gaps exist in her experts' theory as they did in fact show that a shifter could slip into reverse from false park without a manual nudge after sufficient time. This is simply not supported by the record before us. Meyer does not mention any such results in his report. At his deposition, Meyer admitted that he could not recall a result of the shifter self-slipping into reverse after more than seven to eight seconds; instead, he merely stated that the video documenting his tests could be used to determine exact times. The video is not in the record before us, but Roe does cite a document purporting to summarize the video that was attached as an exhibit to her reply brief below. However, a document that was not provided in Meyer's report or referenced in his deposition, and which summarizes a video that is not in the record, does not provide a basis for us to conclude that the district court erred in finding that these results did not actually occur. Indeed, it is unclear who created this document or if it accurately describes the video. Roe points to one reference in Meyer's deposition to a result where the shifter remained perched in false park for four minutes, but Meyer admitted that this

12

four-minute result ended with a manual nudge into reverse, rather than the shifter slipping on its own. Aplt. App. at 1028. Lastly, Roe points to Sullivan's report, which states that Meyer's tests "result[ed] in various effects, including several instances where the transmission would remain unperturbed in a 'False Park' for an extended period of time before eventually slipping into Reverse and accelerating rearwards." Id. at 584 (citing Aplt. App. at 178). But Meyer's report and deposition does not support Sullivan's statement. Thus, the district court's conclusion that the experts failed to document any test results showing a shifter could self-slip into reverse after being perched for longer than seven to eight seconds is supported by the record.[5]

Roe's next contention is that the district court applied the wrong legal standard under Daubert by requiring testing. Aplt. Br. at 34 (citing Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 653 (10th Cir. 1991) (rejecting as an improper standard an "erroneous, per se rule requiring independent testing" as "a precondition to the expert testimony"). FCA argues that the district court was free to require testing because we have held previously that it is acceptable for the district court to place a heavy emphasis on testing when the experts "rel[y] on novel theories" and "the basis for [their] opinion is subject to debate." Heer v. Costco Wholesale Corp., 589 F. App'x 854, 862 (10th Cir. 2014) (unpublished) (citing Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1235–36 (10th Cir. 2004)). Bitler specifically defined "novel

---

[5] Indeed, Roe's counsel at oral argument, contrary to briefing, conceded that Meyer had failed to demonstrate this timing in testing. (Oral Arg. (5:24–6:24)).

13

theories" as theories "that modif[y] otherwise well-established knowledge about [a] regularly occurring phenomenon." Bitler, 400 F.3d at 1235–36. But the theory proposed by the experts here does not modify well-established knowledge and seems to depend largely on well-established principles of physics. Thus, a requirement of independent testing could not be upheld on this basis.

However, the district court did not rely on Bitler for such a proposition or claim that testing was required because the experts presented a novel theory. Instead, the district court excluded their testimony because the experts had a self-contained analytical gap in their theory, relying almost entirely on testing to support their theory and yet failing to show that they actually found that a shifter in false park could slip into reverse on its own after being perched for sufficient time for someone to exit the vehicle and move behind it. Aplt. App. 1271–1273. While Meyer measured the force necessary for the shifter to slip to reverse and Sullivan noted several potential forces that could have nudged the shifter, they failed to specify that the hypothetical forces could actually exert the requisite number of newtons in the proper direction to cause the shifter to engage into reverse or that such forces were present in Roe's car at the time of the accident. Without this testing or additional explanation, it is totally unsupported why the experts believe the shifter could shift on its own into reverse after remaining in false park for sufficient time.

Roe argues that making any specific demonstration as to the timing or the exact forces was not required because her experts used a reasoning-to-the-best-inference approach where they had two potential hypotheses as to the cause of the

14

accident and successfully eliminated one of them. See Bitler, 400 F.3d at 1236–37 (permitting experts to engage in a process-of-elimination approach to the cause of an injury). Meyer did indicate that his testing had ruled out that Roe had placed the vehicle directly into reverse because the test vehicles moved too quickly once the brake pedal was released into reverse. Aplt. App. at 126. But Bitler requires more for this approach than merely eliminating one of the two hypotheses postulated by the expert: "more than mere possibility, an inference to the best explanation for the cause of an accident must eliminate other possible sources as highly improbable, and must demonstrate that the cause identified is highly probable." Bitler, 400 F.3d at 1238 (emphasis added). To demonstrate this, "there must be some independent evidence that the cause identified is of the type that could have been the cause." Id. at 1237.

Because the experts here failed to use any additional testing of their own or by others or other independent evidence to demonstrate that the shifter could remain in a false-park position and slip on its own into reverse after sufficient lag in time, they have not demonstrated that their second hypothesis was even possible—let alone highly probable. Indeed, the reliability of Roe's experts seems questionable when the experts would rule out one hypothesis (e.g., that Roe herself placed the vehicle into reverse before exiting the vehicle) as unviable based on infeasibility in testing, but adopt the only other hypothesis they selected without using the same testing procedures to demonstrate that the other hypothesis is viable and indeed was "highly probable."

Roe's experts did not put on any evidence even that Sullivan's list of hypothetical forces in the vehicle could produce the requisite number of newtons of force in the proper direction needed to cause the shifter to slip into reverse as documented by Meyer or that such forces were highly likely to have been present in Roe's vehicle at the time of this event. See Hoffman v. Ford Motor Co., 493 F. App'x 962, 976 (10th Cir. 2012) (unpublished) (excluding an expert who never showed that the force necessary to trigger a defect seatbelt was present in the subject vehicle).

As a result, the district court did not abuse its broad discretion in excluding the experts' testimony on causation as unreliable.

**B. It is unnecessary to resolve the remaining issues on appeal.**

Roe raises two additional issues. Because these issues do not affect the district court's decision to grant summary judgment in favor of FCA, we need not address them here.[6] Roe argues that the district court abused its discretion in finding Meyer unqualified to testify regarding defective design. However, summary judgment below did not rely on this holding because the district court found Sullivan was qualified to testify as to defective design. Roe also argues that the district court abused its discretion in determining that Meyer and Sullivan were not qualified or reliable to testify on the installation of an out-of-park alarm. The feasibility of an out-of-park alarm is an issue of curing the potential defect that likewise need not be

---

[6] We also decline to consider FCA's alternative grounds to support the exclusion of the experts.

16

addressed when there is no evidence supporting that the asserted defect could cause the accident in the first place. Even if we were to agree with Roe on these issues, we would still have to affirm summary judgment in favor of FCA because Roe has no evidence to create a triable issue of fact on whether the potential defect caused her injury.

## CONCLUSION

For the above reasons, we AFFIRM the district court's grant of FCA's motion for summary judgment.