FILED
United States Court of Appeals
Tenth Circuit

June 7, 2024

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GARY DUMONT RIGGS,

    Defendant - Appellant.

No. 23-5062
(D.C. No. 4:21-CR-00176-GKF-1)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **MURPHY**, and **CARSON**, Circuit Judges.
_____

A jury convicted Gary Dumont Riggs of four counts of aggravated sexual abuse of a minor by force, threat, or fear in Indian Country. The victim was Mr. Riggs's step-granddaughter, S.B. On appeal, Mr. Riggs argues the district court abused its discretion by (1) permitting evidence of his uncharged acts of sexual abuse against S.B., (2) allowing expert testimony concerning the general characteristics of child abuse victims and child abuse disclosures, and (3) allowing a sexual assault

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

nurse examiner to testify about general procedures for conducting sexual assault examinations. We affirm because Mr. Riggs has not shown any abuse of discretion.

## I.    BACKGROUND

### A.    *Factual History*[1]

S.B. grew up in Texas but often spent summers in Oklahoma with Susie Waller, her maternal grandmother. At all relevant times, Ms. Waller was married to and lived with Mr. Riggs. S.B. considered Mr. Riggs to be her step-grandfather and called him "Pawpaw." ROA Vol. II at 111. Mr. Riggs is an enrolled member of the Cherokee Nation.

### 1.    Instances of Sexual Abuse

Mr. Riggs started sexually abusing S.B. in the summer of 2013, when she was twelve years old. The first instance occurred when S.B. was gardening with Mr. Riggs on her grandmother's property in Oklahoma. They went into the barn for something, and Mr. Riggs put one hand down S.B.'s pants and "stuck his fingers in [her] vagina" ("barn incident"). *Id.* at 113. Mr. Riggs then removed his hand, and S.B.'s grandmother walked into the barn. S.B. tried to tell her grandmother what happened but "then brushed it off as a misunderstanding." *Id.* at 114. S.B. "brushed it off" because she "didn't want to ruin the family" and "didn't want something to happen to [her] grandmother." *Id.* at 114–15.

---

[1] These facts are drawn from the testimony and evidence presented at trial.

The next summer, S.B. returned to visit her grandmother and Mr. Riggs. One day, all three of them were sitting around a table doing a puzzle when Mr. Riggs rubbed S.B.'s vaginal area over her pants ("puzzle incident"). S.B. later recalled that she was on her period and wearing a menstrual pad, and she believed the over-the-clothes touching was "the farthest it got." *Id.* at 120. She also recalled that her grandmother was doing the puzzle with them, but the touching "was all happening under the table." *Id.* at 121.

Also in the summer of 2014, S.B. was lying in bed one night when Mr. Riggs entered the room and removed her bed covers. He pulled her pants down, grabbed her ankles, spread her legs apart, and inserted his penis into her vagina. Later that summer, Mr. Riggs again entered S.B.'s room at night, removed her blankets and pants, and inserted his penis into her vagina.

That same summer, Mr. Riggs drove S.B. home from a restaurant that the family had visited after church while the rest of the family remained at the restaurant. During the drive home, Mr. Riggs inserted his fingers into S.B.'s vagina ("driving incident"). When they arrived home, Mr. Riggs took S.B. into a guestroom that had a window, to "make sure that he could stop before anybody came home." *Id.* at 129. In that bedroom, Mr. Riggs again inserted his fingers into S.B.'s vagina. Mr. Riggs then took off his pants and ordered S.B. to put her mouth on his penis, which she did. Additionally—on what S.B. believed to be the same day—Mr. Riggs shoved her to the middle of a bed and put his mouth on her vagina while her legs were spread.

Also in 2014, S.B. visited her grandmother and Mr. Riggs for Christmas. S.B. was with Mr. Riggs in the living room, while the rest of the family was in another room. Mr. Riggs was sitting in a recliner and called S.B. over to him. When she walked over, Mr. Riggs grabbed her on the hips and sat her on his lap. He then unbuttoned S.B.'s pants and "stuck his hands through the front of [her] pants into [her] underwear." *Id.* at 124. Next, he inserted his finger into her vagina. A few months after this incident, S.B. told her friend Hannah that a family member in Oklahoma had raped her.

In March 2015, S.B.'s mother was getting married, and Mr. Riggs visited Texas for the wedding. S.B. was in her room getting changed when Mr. Riggs walked in and touched her ("wedding incident").

S.B. also later recalled an incident involving a four-wheeler ("four-wheeler incident") and an incident that occurred "when [she] was wet" ("swimming incident"). *Id.* at 119. However, she could not recall specifics of either of these incidents.

## 2.     S.B. Discloses the Abuse

In the spring of 2015, when S.B. was in eighth grade, she planned to travel to Oklahoma for a funeral and stay with her grandmother and Mr. Riggs. That plan changed, however, when S.B. told another friend that she was "terrified to go back to [her] grandmother's house" because of "the things that were happening to [her] over there." *Id.* at 134. S.B. did not give her friend "any details," but she "told him what was happening and who was doing it to [her]." *Id.*

4

The friend reported S.B.'s disclosure, and a police officer contacted S.B.'s mother, Kristi Thomas. Ms. Thomas asked S.B. if "what the officer on the phone was saying was true," and S.B. "told her yes." *Id.* at 135. Ms. Thomas relayed this information to S.B.'s father, Randall Benton, who was already in Oklahoma for the funeral. Because of her disclosure, S.B. stayed with Mr. Benton in a hotel instead of staying with her grandmother and Mr. Riggs.

When S.B. arrived in Oklahoma, Mr. Benton asked her what had happened, and she said, "[H]e touched me down there." *Id.* at 485. Mr. Benton asked S.B. if Mr. Riggs "ever put his penis in [her] vagina or things like that," and "she said yes." *Id.*

### 3.    Mr. Riggs's Interview

Gary Stansill, an investigator with the local district attorney's office, interviewed S.B. while she was in Oklahoma for the funeral. A few hours after interviewing S.B., Investigator Stansill interviewed Mr. Riggs as well. Before the interview, Mr. Riggs was informed of and waived his *Miranda* rights.

Mr. Riggs initially denied having any sexual contact with S.B. He then described an incident where he and S.B. were outside gardening, and S.B.'s shirt "just [came] unbuttoned real easy." *Id.* at 363. He told S.B. to ask her grandmother to sew the shirt up. S.B. got "scared" and told her grandmother, Ms. Waller, that Mr. Riggs "touched her." *Id.* S.B. then told Ms. Waller "it didn't happen." *Id.* Investigator Stansill asked if this happened in or near the barn, and Mr. Riggs confirmed this happened in the barn.

5

Despite his initial denials, Mr. Riggs eventually admitted to touching S.B. Specifically, he admitted to touching S.B.'s vaginal area three times. The touching was "[s]ometimes" on the outside of S.B.'s underwear but also occurred on the inside of her underwear. *Id.* at 400. Mr. Riggs said S.B. never told him to stop, and then he stated, "I'm blaming her now. And I'm not going to blame her, you know. I mean, she could have said no, I mean, it – she probably did want to say no. But she didn't." *Id.* at 402.

Mr. Riggs also explained that sometime in the summer of 2014, he was standing in the kitchen after church when S.B. walked over to him, unzipped his pants, and kissed his penis. Mr. Riggs stated that after this incident, "[S.B.] wasn't afraid to touch [him], and [he] wasn't afraid to touch her." *Id.* at 400.

After admitting to these incidents, Mr. Riggs stated, "There's more of me and her doing things, not – not – not me just doing it." *Id.* at 409. He also consistently denied having sexual intercourse with S.B. and penetrating her vagina with his fingers. Nevertheless, Mr. Riggs admitted that S.B. "could have" felt like he "penetrated her" with his hand. *Id.* at 404. And when asked if he "assault[ed]" of his "own free will," Mr. Riggs replied, "Absolutely." *Id.* at 408. He continued, "I should stop it before it even got started, but I didn't. I just agged [sic] it on." *Id.* (alteration in original).

### B.    *Procedural History*

After his interview, Mr. Riggs was arrested and later convicted in Oklahoma state court. Mr. Riggs's state court convictions were vacated following *McGirt v.*

6

*Oklahoma*, 140 S. Ct. 2452 (2020). Thereafter, in April 2021, Mr. Riggs was indicted by a federal grand jury with four counts of aggravated sexual abuse of a minor in Indian Country. The four counts were based on the two instances where Mr. Riggs inserted his penis into S.B.'s vagina, the instance where Mr. Riggs ordered S.B. to put her mouth on his penis, and the instance around Christmastime where Mr. Riggs digitally penetrated S.B.'s vagina.

## 1.  Uncharged Acts Evidence

The Government notified the court and Mr. Riggs of its intent to offer evidence under Federal Rule of Evidence 413. Under Rule 413, "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault." Fed. R. Evid. 413(a). The Government sought to admit evidence of three uncharged acts of sexual misconduct against S.B. by Mr. Riggs[2]—the barn, swimming, and wedding incidents.[3] Mr. Riggs opposed the use of this evidence, arguing the alleged acts were inadmissible under Federal Rule of Evidence 403 because of their prejudicial nature. After a hearing, the

---

[2] The Government also sought to admit evidence of Mr. Riggs's uncharged sexual misconduct toward individuals other than S.B., but the district court excluded that evidence. That ruling is not at issue on appeal.

[3] The Government's notice indicated the barn incident involved a four-wheeler, but S.B. testified that the barn incident was separate from the four-wheeler incident. Additionally, the Government's notice stated that during the wedding incident, Mr. Riggs digitally penetrated and licked S.B.'s vagina. S.B., however, testified only that Mr. Riggs "proceeded to touch [her]." ROA Vol. II at 127.

district court ruled that evidence of the barn, swimming, and wedding incidents was admissible.

The day after the final pretrial conference, S.B. disclosed four additional instances of alleged sexual abuse by Mr. Riggs. Two of these instances were the driving and puzzle incidents.[4] The Government filed a supplemental notice of its intent to present evidence of these uncharged acts at trial, arguing those acts were admissible under Federal Rule of Evidence 414, which permits a court to "admit evidence that the defendant committed any other child molestation." Fed. R. Evid. 414(a).

The district court ruled that two of the incidents were not admissible "given the possibility of confusion," among other reasons. ROA Vol. II at 80–81. However, the court ruled that the driving and puzzle incidents were admissible.

2.    **Kelsey Blevins Testimony**

Through a motion in limine, Mr. Riggs sought to exclude various categories of evidence. Relevant to this appeal, he sought to exclude the expert testimony of Kelsey Blevins, a forensic interviewer. The Government intended to have Ms. Blevins testify to the general characteristics of child sex abuse victims and their disclosures. Mr. Riggs, however, argued that Ms. Blevins was "not qualified to testify regarding general actions taken by trauma victims" and that her testimony

---

[4] The Government's notice specified the puzzle incident involved digital penetration, but S.B. testified that the touching was only over her clothes.

would not assist the jury because it would "do little more than tell the jury that it should believe S.B.'s statement." ROA Vol. I at 68–69.

After a hearing, the district court denied Mr. Riggs's motion to exclude Ms. Blevins's testimony, ruling that Ms. Blevins was qualified "to testify regarding the general behaviors and characteristics of sexually abused children" and that her testimony would assist the jury. *Id.* at 294–95.

**3.    Trial Testimony**

   *a.    S.B. & Hannah*

At trial, S.B. testified to the four instances of sexual abuse that were the basis of the charges against Mr. Riggs. Those instances included the two times Mr. Riggs inserted his penis into her vagina, the time Mr. Riggs ordered her to put her mouth on his penis, and the digital penetration when S.B. was visiting around Christmastime.

S.B. also testified about uncharged acts of sexual abuse, namely the barn, puzzle, driving, four-wheeler, swimming, and wedding incidents. However, S.B. struggled to remember some of these incidents. For example, she testified that there was a "four-wheeler incident," but she did not "really remember what happened." ROA Vol. II at 115. Similarly, the Government asked S.B. about the swimming incident, and S.B. answered that she remembered "a time maybe when [she] was wet." *Id.* at 119. But she did not "really remember" what happened. *Id.* And when asked about the wedding incident, S.B. said Mr. Riggs touched her while she was "attempting to get dressed," but she was "not really exactly sure." *Id.* at 127.

9

S.B.'s friend, Hannah, also testified. Hannah testified that when she and S.B. were in eighth grade, S.B. told her she had been raped by "a close relative" or "family member." *Id.* at 306. S.B. told Hannah the family member lived in Oklahoma.

### b.  *S.B.'s parents*

Ms. Thomas, S.B.'s mother, testified that she learned about S.B.'s disclosure through a phone call from a police officer. When Ms. Thomas discussed the phone call with S.B., S.B. was "visibly upset and crying." *Id.* at 187. Ms. Thomas also testified that after the abuse, S.B. became "very introverted," "leery . . . of new people," and "did some cutting for a while." *Id.* at 190–91.

Mr. Benton, S.B.'s father, testified about his conversation with S.B. when she arrived in Oklahoma after disclosing the sexual abuse. Mr. Benton described S.B.'s demeanor during this conversation as "upset" but also "reserved." *Id.* at 486.

### c.  *S.B.'s grandmother*

Ms. Waller, S.B.'s grandmother, testified about the barn incident. Ms. Waller stated that when she walked out to the garden, S.B. ran up to her and said, "Pawpaw scared me." *Id.* at 203. Ms. Waller testified that S.B.'s statement caused Ms. Waller to become "visibly upset," and she asked S.B. to explain what happened. *Id.* But S.B. did not "divulge any particulars," and she later said, "You know, I think I really misunderstood Pawpaw." *Id.* at 203–04. Ms. Waller recalled that after this incident, S.B.'s behavior "seemed really standoffish" and S.B. "didn't have much to do with [Mr. Riggs]." *Id.* at 205.

10

d.    *Investigator Stansill*

Investigator Stansill testified about his interview of Mr. Riggs, and the Government played a redacted audio recording of the interview.[5] This recording included Mr. Riggs's initial denial and his later admissions that he had touched S.B. outside and insider her underwear. It also included his statement that S.B. unzipped his pants and performed oral sex on him, and his concession that S.B. could have felt like he penetrated her with his hand.

Investigator Stansill further testified that S.B. was not examined by a sexual assault nurse examiner because the sexual acts had not occurred within the past 120 hours.

e.    *Kelsey Blevins*

The Government called Ms. Blevins to testify about the general characteristics of child sex abuse victims, particularly their disclosures. Ms. Blevins testified that she had not interviewed S.B. and did not "know anything about" S.B.'s interviews. ROA Vol. I at 450.

Ms. Blevins explained that "the process of disclosure has a few phases," namely "denial, tentative disclosure, active disclosure, recantation, and reaffirmation." *Id.* at 435. Ms. Blevins also testified that a child may delay disclosing when "the perpetrator is a family member or even just any other known person to the

---

[5] The parties agreed to exclude some portions of the interview, and the district court additionally ordered some parts excluded.

child." *Id.* at 439. Additionally, she testified that a "child's mental health" could cause a delayed disclosure, but "it just kind of depends on each child in each case." *Id.* at 442.

Ms. Blevins also discussed potential inconsistencies and memory gaps in disclosures. For example, she explained that "younger children or preschool-aged children . . . typically can't answer questions regarding time." *Id.* at 441. She further explained that it is "unrealistic" to expect "a child or even an adult" to "remember the dates of the instances they were assaulted." *Id.* at 440. This is particularly true in "cases of long-term sexual abuse" because "the incidents can run together over time." *Id.* at 441.

Ms. Blevins identified several reasons why a victim of sexual abuse may have trouble recalling or disclosing the abuse, including "fear," "guilt," "shame," "institutional blocks," and a "distrust of authority." *Id.* at 446–47.

### f.    Kathy Bell

The Government called Kathy Bell, a sexual assault nurse examiner, to explain general procedures for sexual assault examinations. Mr. Riggs objected, contending Ms. Bell's testimony was irrelevant because S.B. had not been examined by a sexual assault nurse examiner. The district court overruled Mr. Riggs's objection, concluding the testimony was relevant because it helped explain why an examination had not occurred.

Ms. Bell testified that sexual assault exams are performed within 72 hours of the abuse for prepubescent children and within 120 hours for adolescent or

postpubescent children. She also explained what information and evidence a nurse collects during the exam, describing the process as "pretty invasive." ROA Vol. II at 504.

Ms. Bell also addressed misconceptions about hymen tears, explaining that the hymen will not always tear during sexual intercourse and that hymen tears usually heal within three to five days. Ms. Bell further testified that a sexual assault exam would not be done on a fourteen-year-old who disclosed she had been raped nine or ten months prior. This is because the disclosure occurred outside the timeframe where there would be DNA evidence or evidence of a possible hymen tear.

**4.    Verdict**

The jury found Mr. Riggs guilty on all four counts. He received a life sentence and timely appealed his convictions.

## II.    DISCUSSION

Mr. Riggs argues the district court abused its discretion by allowing S.B. to testify about uncharged acts of sexual abuse, permitting Ms. Blevins's testimony, and permitting Ms. Bell's testimony. We review the admission of evidence during trial for abuse of discretion. *United States v. Walker*, 85 F.4th 973, 979 (10th Cir. 2023). We address each of Mr. Riggs's arguments in turn, concluding he has not shown any abuse of discretion.

### A.    *Uncharged Acts Evidence*

At trial, S.B. testified about six uncharged acts of sexual abuse by Mr. Riggs: the barn, puzzle, driving, four-wheeler, swimming, and wedding incidents.[6] The district court allowed this evidence under Rules 413 and 414 of the Federal Rules of Evidence. Mr. Riggs argues the district court abused its discretion by permitting this evidence because its probative value was greatly outweighed by a danger of unfair prejudice. We conclude Mr. Riggs has not demonstrated any error.

Rule 413 provides, "In a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault." Fed. R. Evid. 413(a). Rule 414 is identical, except it substitutes "child molestation" for "sexual assault." *Id.* at R. 414(a). Evidence admitted under Rules 413 and 414 "may be considered on any matter to which it is relevant." *Id.*; *see also id.* at R. 413(a). Thus, Rules 413 and 414 are exceptions to the general rule that evidence may not be admitted "to show a defendant's propensity to commit bad acts." *United States v. Perrault*, 995 F.3d 748, 765 (10th Cir. 2021); *see also* Fed. R. Evid. 404(a) (generally prohibiting propensity evidence).

For evidence to be admissible under Rules 413 and 414, "it must overcome several hurdles." *Perrault*, 995 F.3d at 765 (internal quotation marks omitted). First,

---

[6] The Government argues we should not consider the four-wheeler, swimming, and wedding incidents as acts of sexual abuse because S.B. provided so little detail about them. Although S.B. provided less detail about these incidents, the clear import of her testimony was that they were additional examples of Mr. Riggs sexually abusing her. We thus consider these incidents in our analysis.

the district court must determine that (1) the defendant is accused of sexual assault or child molestation, (2) the proffered acts are evidence the defendant committed another offense of sexual assault or child molestation, and (3) "the evidence is relevant." *Id.*

Mr. Riggs does not argue these threshold requirements were unmet. Rather, his argument focuses on the next stage, where "the district court must conduct a Rule 403 balancing test to assess whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice." *Id.* (internal quotation marks omitted). This "balancing test proceeds in two phases." *Id.*

At the first phase, the district court considers the four *Enjady* factors: (1) "how clearly the prior act has been proved," (2) "how probative the evidence is of the material fact it is admitted to prove," (3) "how seriously disputed the material fact is," and (4) "whether the government can avail itself of any less prejudicial evidence." *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998) (quoting Mark A. Sheft, *Federal Rule of Evidence 413: A Dangerous New Frontier*, 33 Am. Crim. L. Rev. 57, 59 n.16 (1995)); *see also Perrault*, 995 F.3d at 765–66. "[N]o single factor is dispositive." *United States v. Mann*, 193 F.3d 1172, 1175 (10th Cir. 1999).

At the second phase, the district court weighs the *Enjady* factors against the probative danger of the evidence by considering (1) "how likely is it such evidence will contribute to an improperly-based jury verdict," (2) "the extent to which such evidence will distract the jury from the central issues of the trial," and (3) "how time

15

consuming it will be to prove the prior conduct." *Enjady*, 134 F.3d at 1433 (quoting Sheft, *supra*, at 59 n.16); *see also Perrault*, 995 F.3d at 766.

Although courts must conduct the Rule 403 balancing test, exclusion under Rule 403 "should be used infrequently, reflecting Congress' legislative judgment that [Rules 413 and 414] evidence 'normally' should be admitted." *Enjady*, 134 F.3d at 1433 (quoting 140 CONG. REC. H8992 (daily ed. Aug. 21, 1994) (statement of Rep. Susan Molinari)); *see also United States v. Benally*, 500 F.3d 1085, 1090 (10th Cir. 2007) ("Consistent with congressional intent regarding the admission of evidence tending to show the defendant's propensity to commit sexual assault or child molestation, courts are to liberally admit evidence of prior uncharged sex offenses." (internal quotation marks omitted)).

Mr. Riggs argues only that the uncharged acts were inadmissible because of their prejudicial nature. We thus limit our analysis to the Rule 403 balancing test.

### 1.    First Phase: *Enjady* Factors

Mr. Riggs does not address the third *Enjady* factor ("how seriously disputed the material fact is"), so we limit our analysis to the other *Enjady* factors. *See Enjady*, 134 F.3d at 1433 (quoting Sheft, *supra*, at 59 n.16); *see also Perrault*, 995 F.3d at 766 (considering only factors disputed by the defendant).

a.    *How clearly the prior act has been proved*

Mr. Riggs argues the uncharged acts were not proved because S.B. could not recall many of the specifics.[7] We agree that S.B. provided little information about the four-wheeler, swimming, and wedding incidents. Indeed, concerning the four-wheeler and swimming incidents, S.B. did not testify what alleged sexual act occurred. And for the wedding incident, she testified only that Mr. Riggs "proceeded to touch [her]." ROA Vol. II at 127.

However, the other three uncharged acts were proved more clearly. Although S.B. could not remember some of the details, she testified that Mr. Riggs digitally penetrated her inside the barn, rubbed her vaginal area while they were doing a puzzle, and digitally penetrated her while they were driving back from church.

Moreover, there was corroborating evidence. Ms. Waller testified that while they were gardening, S.B. ran out of the barn and was upset with Mr. Riggs but later said it was a misunderstanding. Mr. Riggs also brought up an incident at the barn during his interview, although he stated he did not touch S.B. Nevertheless, Mr. Riggs admitted to touching S.B.'s vaginal area outside and inside her underwear.

---

[7] The parties litigated the admissibility of the uncharged acts before S.B. testified. Mr. Riggs argued the uncharged acts were inadmissible under Rule 403 because they would inflame and confuse the jury. As S.B. had not yet testified, however, Mr. Riggs did not argue the evidence was inadmissible given S.B.'s inability to recall details. But when S.B. testified and was unable to recall some details, including details supplied in the Government's proffers, Mr. Riggs did not object or request a limiting instruction. Nevertheless, we consider Mr. Riggs's argument on appeal concerning S.B.'s memory issues because even considering this argument, we conclude the district court did not err.

And although he denied that there was ever penetration, he conceded that S.B. "could have" felt like he "penetrated her." *Id.* at 404.

In short, while three of the incidents were not clearly proved, S.B. provided specifics about the other three incidents, and there was corroborating evidence.

      b.     *Probative value of the uncharged acts*

When weighing the probative value of evidence, courts consider "(1) the similarity of the prior acts and the charged acts; (2) the time lapse between the other acts and the charged acts; (3) the frequency of the prior acts; (4) the occurrence of intervening events; and (5) the need for evidence beyond the defendant's and alleged victim's testimony." *Perrault*, 995 F.3d at 776 (quotation marks omitted).

Mr. Riggs argues the uncharged acts had "minimal probative value" because S.B.'s testimony was "vague and crippled by memory issues." Appellant's Br. at 23. Although we agree S.B. provided few details about the four-wheeler, swimming, and wedding incidents, they still had probative value. That is because S.B.'s recollections supported the Government's theory that the abuse was so frequent the incidents blurred together in S.B.'s memory.

And for additional reasons, the barn, puzzle, and driving incidents had significant probative value. First, these incidents and the charged acts all involved vaginal touching or penetration. Second, these incidents and the charged acts all occurred relatively close together—the barn incident was in the summer of 2013, and the remaining incidents occurred in 2014. Third and fourth, S.B.'s testimony demonstrated the vaginal touching occurred with some frequency, and there were not

18

any intervening events that diminished the probative value of the acts. And finally, there was no need for evidence beyond the testimonies of S.B. and Mr. Riggs because they were the only people involved.

For these reasons, the uncharged acts carried significant probative value.

### c. *Less prejudicial evidence*

Mr. Riggs argues the Government could have availed and did avail itself of less prejudicial evidence, namely Mr. Riggs's interview and S.B.'s parents' testimonies. We disagree.

S.B.'s parents did not witness any of the abuse, so their testimonies would not have been adequate substitutes. And although Mr. Riggs vaguely admitted to some touching, he denied any penetration. Thus, his interview could not have substituted for the uncharged acts involving penetration, namely the barn and driving incidents. Moreover, Mr. Riggs testified to touching S.B. only three times, so his testimony would not have substituted for the other acts evidence, which the Government used to demonstrate the frequency of the abuse. As a result, this factor does not weigh in Mr. Riggs's favor.

## 2.    Second Phase: Probative Dangers

Having considered the *Enjady* factors, the next question is the probative danger of the evidence. Because Mr. Riggs does not discuss the third probative danger consideration ("how time consuming it will be to prove the prior conduct"), we do not address it either. *See Enjady*, 134 F.3d at 1433 (quoting Sheft, *supra*, at 59 n.16).

a.    *Will the evidence contribute to an improperly based verdict?*

Mr. Riggs argues S.B.'s testimony regarding the uncharged acts "is the type of testimony that arouses emotions." Appellant's Br. at 24. However, the danger of an improperly based verdict was minimal for several reasons.

First, S.B.'s testimony concerning the uncharged acts was less graphic than her testimony concerning the charged acts. The charged acts included Mr. Riggs inserting his penis into S.B.'s vagina, digitally penetrating S.B.'s vagina, and ordering S.B. to put her mouth on his penis. It is unlikely the jury would have overlooked S.B.'s testimony about these charged acts and instead punished Mr. Riggs for the comparatively less graphic uncharged acts.

Second, the jury heard Mr. Riggs's interview, where he made several inculpatory statements. He admitted to touching S.B. outside and insider her underwear and stated she "could have" felt like he "penetrated her." ROA Vol. II at 404. He also admitted there was oral sex but claimed S.B. was the instigator. Additionally, Mr. Riggs stated that S.B. "probably did want to say no" and agreed that he "assault[ed]" of his "own free will." *Id.* at 402, 408. Given these statements— combined with S.B.'s testimony about the charged acts—we are not persuaded the jury convicted Mr. Riggs based on the uncharged acts.

And finally, the district court instructed the jury that although it heard evidence Mr. Riggs "may have previously committed other offenses of child molestation," it could "consider this evidence only if [it] unanimously [found the evidence] is more likely true than not true." ROA Vol. II at 543–44. The court further

20

instructed the jury that it could not convict Mr. Riggs "simply because [it] believe[d] he may have committed similar acts in the past." *Id.* at 544. We have previously recognized that limiting instructions like these "can mitigate any potential jury bias from Rule 414 witnesses." *Perrault*, 995 F.3d at 770.

      b.      *Will the evidence distract the jury from the trial's central issue?*

Mr. Riggs argues the uncharged acts were distracting because the jury would have needed "to consider and decide unanimously the veracity of six additional acts on top of the four charged counts." Appellant's Br. at 25. While the district court instructed the jury it had to "unanimously find" that the uncharged acts occurred to consider them, that does not mean the jury needed to unanimously agree the uncharged acts occurred to convict Mr. Riggs. *See* ROA Vol. II at 544. The jury could have just as well decided the uncharged acts were unnecessary to the conviction.

## 3.     Weighing the Factors

Considering all factors, Mr. Riggs has not shown an abuse of discretion. The barn, puzzle, and driving incidents were highly probative because they demonstrated Mr. Riggs's propensity for molesting S.B. And although S.B. could not provide details of the four-wheeler, swimming, and wedding incidents, her testimony supported the Government's theory that the abuse occurred so frequently that S.B. struggled to recall specifics. Additionally, none of these incidents carried a substantial danger of unfair prejudice because the charged conduct was more graphic and because the district court gave limiting instructions. Finally, with respect to

21

Rules 413 and 414 evidence, exclusion "under Rule 403 should be used infrequently." *Perrault*, 995 F.3d at 766 (quotation marks omitted). For these reasons, the district court acted within its discretion when it concluded the probative value of the uncharged acts was not substantially outweighed by a danger of unfair prejudice. Because Mr. Riggs has not shown an abuse of discretion, we do not consider the Government's alternative argument that any error was harmless.

### B.   Kelsey Blevins Testimony

Mr. Riggs next argues the district court abused its discretion by permitting Ms. Blevins's testimony concerning the general characteristics of child abuse victims and child abuse disclosures. He argues Ms. Blevins's testimony should not have been allowed because it was not helpful to the jury and only bolstered S.B.'s credibility.[8] We conclude Mr. Riggs has not shown an abuse of discretion.

Under Federal Rule of Evidence 702, expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Mr. Riggs contends Ms. Blevins's testimony did not help the jury because "the general characteristics, trauma, mental health, and reporting methods of child victims of assault all touch on credibility—an issue that the jury can understand without expert testimony." Appellant's Br. at 29–30. But we rejected an identical argument in

---

[8] On appeal, Mr. Riggs does not argue that Ms. Blevins was unqualified to testify or that her methods were unreliable. *See Roe v. FCA US LLC*, 42 F.4th 1175, 1180–81 (10th Cir. 2002) (explaining that experts must be qualified and their opinions must be reliable) (citing Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).

*United States v. Parson*, 84 F.4th 930 (10th Cir. 2023). There, the defendant argued that "expert testimony as to the process of child-sex-abuse disclosures and the characteristics of abused children" was irrelevant. *Parson*, 84 F.4th at 937. We disagreed, explaining that the testimony was relevant "because the average juror often lacks expertise on the characteristics of victims of child sex abuse, particularly in the process of disclosing such abuse." *Id.* at 938.

Additionally, the expert testimony in *Parson* was relevant because the defendant sought to discredit the child victim's testimony based on "delayed reporting and inconsistencies between her later disclosures and earlier denial." *Id.* So too here. Mr. Riggs attempted to discredit S.B.'s testimony by pointing out her recantation during the barn incident, various inconsistencies, memory failures, and late disclosures. Accordingly, like in *Parson*, Ms. Blevins's testimony helped the jury evaluate S.B.'s credibility. *See id.* at 938–39.

Nevertheless, Mr. Riggs argues that Ms. Blevins's testimony should have been excluded because it improperly vouched for S.B.'s credibility. Expert testimony is improper if it "does nothing but vouch for the credibility of another witness" and thus "encroaches upon the jury's vital and exclusive function to make credibility determinations." *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999). But Ms. Blevins did not vouch for S.B.'s credibility. Rather, Ms. Blevins testified that she had not interviewed S.B. and did not "know anything about" S.B.'s interviews. ROA Vol. I at 450. Moreover, her testimony was about the disclosure process and child abuse victims in general. This case is thus like *Parson*, where we held similar

23

testimony was not improper because the expert "did not opine about [the victim's] credibility or about whether a crime had been committed," and testified "she never spoke with [the victim], had not reviewed any documents relating to [the victim], and did not know whether [the defendant] molested [the victim]." 84 F.4th at 939.

Mr. Riggs, however, contends this case is distinguishable from *Parson* because he is not arguing "for the categorical exclusion sought in *Parson*." Reply at 7. Instead, he argues Ms. Blevins's testimony was improper because it "was tailored to address issues that were present in S.B.'s testimony and prior statements." Appellant's Br. at 28. But the expert testimony in *Parson* also focused on issues relevant to the victim's disclosure, and we still held the testimony was not improper bolstering. *See Parson*, 84 F.4th at 933–34, 937–39 (describing expert's testimony that abused children may delay reporting and have trouble recalling details, and then explaining the victim made inconsistent, delayed disclosures). Further, Ms. Blevins's testimony did not directly track S.B.'s. For example, Ms. Blevins testified about accidental disclosures, the ability of preschool-aged children to answer questions, and how children may react if they have previous experience with child welfare or law enforcement. These topics were not applicable to S.B., so it is inaccurate to say Ms. Blevins's testimony was "simply an expert opinion that S.B. was telling the truth." Appellant's Br. at 27. Additionally, given the requirement that evidence be relevant, we can hardly fault the Government for focusing its questions on topics that were germane to the issues at trial. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

Ms. Blevins's testimony "was limited to describing the general process of disclosure, the different types of disclosures, and the reasons why disclosures may vary." *Parson*, 84 F.th at 939. The district court thus did not abuse its discretion by allowing Ms. Blevins's testimony.

### C.     *Kathy Bell Testimony*

Lastly, Mr. Riggs argues the district court abused its discretion by allowing Ms. Bell to testify about general procedures for sexual assault nurse examinations. He contends the testimony was irrelevant because S.B. was not medically examined, let alone by a sexual assault nurse examiner. We disagree.

Evidence must be relevant to be admissible. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Id.* at R. 401. Relevance is a low bar. *United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007).

Ms. Bell testified that under the circumstances, a medical exam of S.B. to collect physical evidence would have been futile. Her testimony thus helped explain the absence of physical evidence. We have held that "absence-of-evidence testimony" is relevant. *See United States v. Dalton*, 918 F.3d 1117, 1132 (10th Cir. 2019) (concluding district court did not err by permitting the government to call expert witnesses to testify about a lack of physical evidence).

Here, Ms. Bell's testimony was relevant because it suggested the absence of an exam or physical evidence did not unavoidably mean the abuse had not occurred.

25

Additionally, Ms. Bell's testimony made it more likely that Oklahoma conducted a thorough investigation, thus dispelling potential concerns the case was hastily brought. *See United States v. Tavares*, 843 F.3d 1, 7 (1st Cir. 2016) (concluding expert testimony "suggested that the absence of usable prints did not mean, ipso facto, that the weapon was never in the defendant's hands, or that the police work was shoddy").

Yet, Mr. Riggs argues this case is different from other absence-of-evidence cases because here, the Government did not even attempt to look for the absent evidence. That distinction, however, is not meaningful to the relevance of the evidence because Ms. Bell's testimony helped explain why the Government did not even attempt to gather physical evidence through a medical exam. Mr. Riggs next argues that Ms. Bell's testimony was irrelevant because "no issue had been raised to the jury, either in opening statement, cross-examination, or summation, about the lack of a sexual assault examination." Appellant's Br. at 32. While neither party raised the issue, the jury could have independently questioned the absence of a medical exam or physical evidence, and the district court did not abuse its discretion by allowing the Government to address this potential concern. *See United States v. Feldman*, 788 F.2d 544, 554–55 (9th Cir. 1986) (holding absence-of-evidence testimony was admissible to address "anticipated arguments").

Additionally, Mr. Riggs argues the evidence was irrelevant because Investigator Stansill had already testified as to why a medical exam did not occur. But Investigator Stansill, unlike Ms. Bell, did not testify about the general procedures

26

for sexual assault exams and their invasive nature. Nor did Investigator Stansill discuss general misconceptions about hymen tears. Moreover, the Government could have determined that it needed a witness with more expertise on sexual assault nurse examinations than Investigator Stansill.

For these reasons, the district court did not abuse its discretion by allowing Ms. Bell's testimony.

## III.    CONCLUSION

Mr. Riggs has not shown any abuse of discretion in the district court's evidentiary rulings. We thus AFFIRM.

Entered for the Court


Carolyn B. McHugh
Circuit Judge